By the Court. Bosworth,
The appeal from the judgment is stated, in the notice of appeal, to be from so much of it as decides—•
First, that the resolution finally adopted by the Common Council of the city of New York was not a law, but the grant of a franchise, which from the time of its acceptance became a contract.
Second, from so much as decides that the Common Council had no power or authority to make such grant.
Third, from so much as decides that the grant, for reasons manifest on its face, is illegal and void.
Fourth, from so much as decides that the grantees named in the resolution be enjoined from constructing the railway authorized by it, and
Fifth, from so 'much as decides that the Mayor, Aldermen, and Commonalty of the city of New York be enjoined from granting to any person the exclusive privilege of constructing a railroad in Broadway.
There is also a separate appeal from so much of the order of the 9th of November, 1853, as directs the complaint to be amended by inserting therein the name of the Attorney General, as a party plaintiff, and also from so much of that order as directs the amendment to be without prejudice to the proceedings previously had.
Both appeals were heard at the same time. The appeal from the order involves questions of practice. The appeal from the judgment involves the questions, what is the nature of the resolution complained of; was the Common Council legally competent to pass it; was it illegal and void, or legal and valid ?
*142 The resolution confers upon certain persons named in it the right to construct a railway, with a double track, through Broadway, and in or near the middle of the street, from the South Ferry to Fifty-ninth street, and to run passenger cars upon it, for their exclusive personal profit and emolument^ It contains no provision authorizing the Common Council to rescind or repeal it, and so far as its language expresses the period of its duration, it may be perpetual. So long as the “ conditions and stipulations,” upon which “ the said grant of permission "and authority” is made, are kept and performed by the grantees, no power is reserved to repeal it.
The twelfth article stipulates, that for ten years from the date of opening the railway, the associates shall have a license for each car that may be run, for $10 per annum.
The right is conferred to construct a railroad and run as many cars upon it both ways, and as frequently, as the public convenience may require, on paying a fee of $10 annually per car, and the privilege is granted of charging each passenger five cents. Ño other persons can carry passengers for hire during this term of time, through Broadway, by this mode of conveyance.
The thirteenth, fourteenth, and fifteenth articles, by their terms, confer authority upon a majority, in interest, of the associates to “ form themselves into a joint stock association,” and vest in the association all the rights and privileges granted, and grant the power of determining the mode of transferring the interest of any associate to new associates, and provide that it shall not be dissolved by the “ death or act ” of any associate, and also that any new associates who may be admitted according to the provisions of the grant and such bylaws as the associates may ordain, shall be deemed parties to the agreement by which the grant has been assented to and accepted. In short, so far as its terms speak, it confers all the rights and privileges of an act of incorporation by a statute of the Legislature of the state, except that of sueing and being sued by the name of the association, and an exemption of the associates from personal liability for the debts of the association.
The fifteenth article has provided for the difficulties that might result from these differences between the rights, liabili *143 ties, and exemptions of a §ws¿-corporation created by the Common Council, and an actual incorporation under a law of the state, by enacting that “ said associates may at any time incorporate themselves under the general railroad act whenever two-thirds, in interest, of the associates shall require it.”
If this provision confers the authority which its terms purport to grant, then the associates may be incorporated as well after the road is constructed as before it is commenced. The general railroad act does not authorize the creation of an incorporation to maintain and operate an unincorporated railroad not constructed at the time that act took effect. (Laws of 1850, P- 211, § 1.)
If the authority conferred is valid, two-thirds in interest may effect an incorporation after the road has been constructed, no matter how small the number of the persons holding that interest, and notwithstanding the others dissent. The whole number of associates on whom this authority is conferred is thirty. Two-thirds of this" number is twenty, and two thirds in interest may consist of a smaller number of associates. The Act makes it indispensable that not less than twenty-five persons shall unite in forming a company. The whole number of associates may be less than this.
If the authority conferred is valid, the associates may be incorporated, after the road is constructed, although it is not constructed in conformity with the positive requirements of the Railroad Act.
That act prohibits the use, in the construction of any road, by a company formed under it, of any iron rail of less weight than 56 pounds to the linear yard, (§ 27.) It authorizes the running of freight trains, as well as passenger trains, (§§ 36 and 38.) It requires every corporation formed under it, to erect and maintain fences on the sides of their road, of the height and strength of a division fence required by law, and to construct and maintain cattle guards, at all road-crossings, suitable and sufficient to prevent cattle and animals from getting on to the Railroad, and provides that if any person shall ride, lead, or drive any horse or other animal upon such road, and within such fences and guards, other than at farm-crossings, without the consent of the corporation, he shall, for every such offence, *144 forfeit a sum not exceeding ten dollars, and shall also pay all damages, which shall be sustained thereby, to the party aggrieved, (Id. p. 233, § 44.) Cities are not exempted by the act itself, from the operation of this section.
As the cars cannot be run, except by keeping their wheels in the grooves of the rails, the resolution abrogates a statute of the state, relating specially and solely to this city.
The 198th section of the act of April 9, 1813, declares, “ that in all cases of persons meeting each other in any street or road, in the city and county of Hew York, in carriages, waggons, carts, or sleighs, each person so meeting shall go to that side of the street or road on his right, so as to enable the carriages, waggons, carts, or sleighs so meeting, to pass each other, under the penalty of five dollars for every offence, to be recovered by an action of debt, with costs of suit, in any court having cognizance thereof, by any person suing for the same.” (2 R. L. p. 424, § 198.)
Every person going on either track with a carriage or cart, and meeting a car going in the opposite direction, must move wholly out of the way of the car, and the car is not obliged to be turned out of the direction marked by its track, and from the nature of things cannot be. If instead of meeting a car, any other vehicle had been met at precisely the same spot, the person driving the latter must turn to that side of the street on his right, and every failure to do so, would subject him to a penalty of $5, and the costs of a suit to recover it.
A grant of the powers, privileges, and immunities conferred by the resolution in question, is the grant of a franchise, and if the Municipal Incorporation of this city was incompetent to make the grant, the making of it was a usurpation of power which can lawfully be exercised by the Legislature of the state only.
A franchise has been defined to be “ a privilege or immunity of a public nature, which cannot legally be exercised without legislative grant. To be a corporation is a franchise; the various powers conferred on corporations are franchises; the execution of a policy of insurance by an insurance company, and the issuing of a bank note by an incorporated banking company are the exercise of franchises; without legislative authority, *145 neither could lawfully be done by a corporation; and were a bank to execute a policy of insurance, or an insurance company to issue bank notes, such acts would be usurpations of franchises.” (The People v. Trustees of Geneva, College, 5 Wend. 217 ; The People v. Utica Insurance Company, 15 I. R. 387.)
The resolution, by its terms, assumes, and the defendants’ counsel insists, that the Common Council had legislative capacity to pass it, and the merits of the controversy, as the appeal presents them, depend upon the question, whether this assumption is well founded.
Keither of the City Charters, nor any statute of the state, confers any such power in express terms. It is not apparent that it is conferred by implication as being necessary to the exercise of any power expressly granted. We have not been referred to the grant of any express powers, or the enactment of any particular duty which makes it necessary to imply the existence of such authority, in order to properly exercise the one or perform the other. (Vide 2 Selden 92, 4 Hill 83, as to powers of municipal corporations.)
If no such power is conferred by the express terms of its charter, or by the express terms .of a statute of the state, or by necessary implication, the assertion of such a right is the usurpation of a franchise. The right here claimed is of a public nature; it affects the public at large. Here there is no remedy by action to recover damages, no individual in particular is specially aggrieved, but the public at large are affected. The authority of the legislature is put at defiance by a creature of its own creation. (5 Wend. 220.)
So far as the terms of the resolution limit the duration of the grant, it may be perpetual. If such is the effect of its terms, if it is valid by reason of the capacity of the Common Council to make the grant, the acceptance of the grant and the construction and maintenance of a railroad in such manner as will fully comply with all the conditions and provisions of the grant, will confer rights of property which cannot be divested by a repeal of the resolution by any subsequent Common Council, unless upon some ground or for some cause other than a purpose to put an end to the contract, because it wills to do so.
It was urged on behalf of the defendants, that the grant *146 was not void merely for the reason, that by the necessary meaning of its terms it binds the municipal corporation to allow the enjoyment of the privileges granted as long as the conditions of the grant shall be complied with. That the members of the Common Council that made it, could not bind their successors; that any subsequent Common Council, of its own mere will and pleasure, can annul it; and that it should be construed .as it would be, if the power to annul it at any time, without cause, was expressly reserved in the Resolution itself. That nevertheless it was not void when passed, but was valid and revocable, and will remain valid until actually revoked or annulled.
No case has been cited, which asserts the doctrine that a municipal corporation can break its valid contract with impunity, merely because it does not choose to perform it, or that a mere resolution to rescind it without cause, would not impair the obligation of contracts, if the resolution could be held to repeal it and at the same time to exempt the corporation from liability to damages or from amenability to the process of the courts to compel specific performance. That a statute of the state, which is in its nature a contract, and which does not reserve to the legislature the power to repeal it, cannot by a subsequent repeal divest rights acquired under it, is settled law. (Fletcher v. Peck, 6 Cranch, 87; The State of New Jersey v. Wilson, 7 Cranch, 164; Terrett v. Taylor, 9 Id. 43 ; Dartmouth College v. Woodward, 4 Wheat. 518.)
In the latter case, Mr. Justice Story declared the rule to be, that immunities, franchises, and other rights, whenever they are the subjects of a contract or grant, are just as much within the reach of the Constitution of the United States, as any other grant.
Such being deemed to be the settled law, a provision was incorporated into the Revised Statutes in these words, viz. “ The „ charter of every corporation, that shall hereafter be granted by the legislature, shall be subject to alteration, suspension, and repeal in the discretion of the legislature.” (1 R. S. 600, § 8. The People v. The Manhattan, Co., 9. Wend. 351, 392-3.) But for this pre-existing law, it would be necessary to insert in every act of incorporation a reservation of the power to repeal *147 or modify it, to enable any subsequent repealing statute to have the effect to divest any rights to property, which had been acquired and vested under it.
It is laid down as an elementary principle, that as neither a state nor the general government can transcend the powers conferred upon them by their constitutions, so a corporation acting by the grant of either, must of course be bound by the supreme law, which limits even the power that created it a corporation. Neither a state, nor the general government, can grant legislative powers larger than they possess themselves. “ Hence, however unlimited in this particular may be the terms of its charter, all by-laws of a corporation, contrary to the constitutional law of the land, must be void. For this reason, a by-law impairing the obligation of contracts, or taking private property for public use, without just compensation, is void.” (Ang. and Ames on Cor. 182, § III.)
Several cases were relied upon by the defence as deciding the principle that the Common Council might, at any time, annul the grant, that such an ordinance would 'divest all rights acquired under it, and would not be a breach of the contract; and though a legislative act, would not be one impairing the obligation of a contract, and, among others, we were referred to 5 Cowen, 538, and 7 Cowen, 585. We do not think that these cases countenance, much less affirm, such a doctrine.
In 5 Cowen, 538, the corporation of this city had conveyed the premises, in 1766, on which the brick Presbyterian church, belonging to the plaintiffs, stood, reserving an annual rent, and covenanted that the lessees and their assigns, on paying the rent reserved, and performing the conditions contained in the lease, should quietly use and enjoy the premises without any let or hindrance of the defendants or any other person. On the 27th of October, 1823, the defendants, under a special authority conferred by the legislature (2 R. L. 445, § 267), passed a by-law prohibiting the use of the premises, as a cemetery, for the interment of the dead. The plaintiffs brought an action to recover damages for a breach of the covenant .for quiet enjoyment.
The court said that “ the liability of the defendants, upon the covenant in question, must be the same as if it had been *148 entered into by an individual, and the effect of the by-law upon it, the same as if that by-law had been an act of the state legislature. It is expressly authorized by the legislature, and whether it be their act or an act of the local city legislature, can make no difference.” (Id. 540-541.)
The cause was decided in favor of the défendants, not on the ground that the grant was revocable at pleasure, from mere caprice, nor on the ground that the corporation could relieve itself from its obligations under a valid contract without assigning a cause, or without legislative authority, but on the ground that every right, from an absolute ownership in property, down to a mere easement, is purchased and holden subject to the restriction, that it shall be so exercised that its use shall not become a public niiisance. That an act of the legislature, declaring a particular use a public nuisance, and prohibiting such use, is a constitutional íaw, and gives no claim in favor of a purchaser against a vendor, who conveyed it with a covenant for its quiet enjoyment. Such a law does not take private property for public use, for the property is not taken nor is any entry made upon it; the title is not divested nor impaired; only a certain use is prohibited, which, from, the increase of population, would be a nuisance. And, for the same reason, in such a case, there is nothing, in the act, impairing the obligation of contracts. The court was also careful to say that “an unwarrantable interference with private property is equally unconstitutional and void, whether by a state legislature or a corporation. By neither can it be touched without necessity ; and then, if taken, it must be upon just compensation.” (7 Cowen, 606.) “The liability of the defendants, therefore, upon the covenant in question, must be the same as if it had been entered into by an individual.” (5 Cowen, 540.)
The grant cannot be annulled from mere caprice. Though an act of the state legislature has empowered the corporation to pass by-laws and ordinances preventing the interment of the dead within the city, it has passed no law authorizing it to annul its valid grants, or terminate its valid contracts, because 'it may be pleased to do so for no reason except that it may be its will and pleasure to repudiate them. Ho corporation, municipal or otherwise, possesses any powers except such as *149 have been granted to it, and no state can grant to a corporation power to do that which it cannot constitutionally do itself.
The legislative power of a corporation is- not only restricted by the constitutional and statute law of the state in which it is located, but by the general principles and policy of the common law, as it is accepted there. It is upon this principle that though many by-laws passed by the ancient municipal corporations and trade companies in England, for the regulation of trade and the prevention of monopoly, were held good, yet many have been held void, as being in restraint of trade and an oppression to the subject. (Dunham v. Trustees of Rochester, 5 Cow. 462.)
Will it be pretended that a subsequent Common Council, after the road has been constructed and put in operation, and while all of the conditions of the grant are observed by the grantees, can lawfully repeal the grant, and by the same resolution make a similar grant, in all respects, to others ? If it cannot, then it has bound itself in perpetuity for the enjoyment by the grantees and their assigns, of the rights and privileges granted, on their performing the conditions on which the grant was made.
The fact that the manner of using it is so far subject to legislative control that it can lawfully be so restricted as not to become a public nuisance, or otherwise endanger the health or lives of individuals, furnishes no ground for holding that the grant, if valid, can be arbitrarily repealed, or the rights acquired under it annihilated at the mere will and pleasure of the party, though a corporation, who contracted, upon consideration, for their enjoyment in perpetuity.
It is conceded that the Common Council cannot divest itself of, nor abridge its legislative discretion, to alter and regulate the streets as it may deem expedient. It cannot be denied that it has no power to prohibit such use of them as the legislative authority of the state has granted to every citizen as a matter of strict right. (2 R. L. 424, § 298.) This grant will produce both results, if valid, and if it confers the rights and privileges which it purports to grant.
To say that the contract is valid but voidable at pleasure, and valid until avoided, is to affirm that the Common Council *150 have not, in fact, made such a contract as its provisions express. That though by its terms the rights and privileges granted are to be enjoyed without molestation by the grantees and their assignees, for ever, on their performing the conditions to be observed on their part, yet in fact no such contract has been made. That it is in effect a mere license by the Common Council that these privileges may be enjoyed until it shall be pleased to revoke the license. The contract made is to be determined by the legal import of its terms. If it is not obligatory upon the Common Council, it must be for the reason that it was incompetent to make it. If incompetent to make a valid contract, such as it has made, it necessarily follows that it is void. It also follows that the attempt to make it, and thereby confer rights and powers which the state legislature is alone competent to confer, and to absolve the grantees from duties from which only the same authority can exonerate them, is a usurpation of power and an illegal exercise of a franchise.
The privileges granted to the associates are exclusive in their nature. They are granted with the right and authority to appropriate to the use of the grantees and their assigns exclusively, the advantages and emoluments that may arise from their enjoyment. Ho, other person, or association of persons, can be authorized by the Common Council to run cars for hire, upon the road, without a clear violation of the contract. They are to run cars both ways as often as public convenience requires, they are to receive from each passenger fare for riding on their cars, and are authorized to establish by-laws, “ providing for the construction, operation, and management of the said railway.” If at the end of the ten years they do not consent to pay such license fee, per car, as the corporation, with permission of the legislature, shall then prescribe, they agree to “ surrender the road, with all the equipments and appurtenances thereunto belonging, to the said corporation, at a fair and just valuation of the same.”
In a contract between individuals, by which an owner of land should contract that a third person might erect structures and operate machinery upon it, without any limitation as to time, on paying a certain rate per annum for the first ten years, and providing that if at the end of ten years he should not pay the *151 annual sum then exacted for the privilege, he should surrender the structures and machinery .to the owner of the land upon receiving their just value, it is not clear that the owner, in such contingency, would not be bound to pay such value and accept a surrender of the property.
However that may be, it is obvious that the spirit and fail-meaning of the contract are, that the grantees shall have the exclusive right and privilege of running cars upon the road for their private emolument. And in every grant of a franchise, the implied powers and rights conferred by it, are as much beyond the control of subsequent legislation as powers and rights expressly granted. (The People v. The Manhattan, Co., 9 Wend. 351.)
It creates an unincorporated association, and exempts it from the operation of the rules of the common law, which define the rights and liabilities of partnerships. The latter declare that a partnership shall be dissolved by the death of one of its members, and give to his personal representatives a right to have an adjustment of the accounts and a division of the property or of its proceeds. This .grant declares that neither the death nor any act of either of the associates shall work a dissolution of the partnership, but that the successor in interest of any one who may die shall stand in his place, and the continuance of his rights shall depend upon his fulfilment of the conditions imposed by the grant, and his compliance with the articles of association, and the by-laws it may establish. Such rights and liabilities the legislature of the state has alone the power to create and impose®.
The 9th section of the amended charter of 1849 (Laws of 1849, p. 280) declares that the executive power of the Corporation shall be vested in the Mayor and heads of departments, and such other officers as may be created by law, and that the Common Council shall not perform any executive business whatever, except such as is specially imposed by the laws of the state. The 14th section enacts that there shall be an executive department, to be denominated the “ Department of Streets and Lamps,” which shall have cognizance “ of cleaning the public streets, and collecting the revenue arising from the sale of manure.”
*152 The 22d, that all contracts to be made for work to be done, shall be made by the appropriate' heads of departments, under such regulations as shall be prescribed by the Common Council.
The 10th article of the grant makes a contract with the grantees, by which the latter contract to sweep and clean so much of Broadway as extends south of Fourteenth street, in the morning and evening of each day, except Sundays, whatever the weather may be, and so much of it as lies between Fourteenth and Fifty-ninth streets, equally often, when the weather will permit. It is not a contract to remove so much of rubbish and dirt, as the use of the road shall bring into the street, but to sweep and clean the entire street, and carry away the sweepings, in the morning and evening of each day, for all time to come, and the price paid for it is the grant of a franchise with the right of perpetual enjoyment. This would seem to be clearly prohibited by the provisions of the amended charter above referred to.
Without entering upon the consideration of other objections taken to the legality and validity of the grant, we think it void, on the grounds—
First, that it grants a franchise, which the Common Council has no authority to grant.
Second. The grant, by the meaning and legal import of its terms, may be perpetual.
Third. The grant is, in judgment of law, a contract between the Corporation and the grantees, and, in its legal import, restricts the Corporation in the future exercise of its legislative powers.
Fourth. It confers upon the grantees and their associates exclusive privileges to a partial use of Broadway, which may be of perpetual duration.
Fifth. It absolves them from an obligation imposed on them by a statute of the state. (2 R. S. 424, § 198.)
Sixth. It confers rights, and exempts the associates from consequences, in the event of the death of one of their number, repugnant to, and conflicting with, the settled law of the state.
Seventh. It authorizes the associates to become incorporated at any time, under the general railroad act, although the road may have been previously constructed, and whatever may be *153 their number at the time, while the act itself does not allow an incorporation after a road shall have been built, nor of a less number than twenty-five.
Eighth. It makes a contract, which the Common Council has been prohibited from making, by the amended charter of 1843.
The attempt to make a grant conferring such privileges and immunities, without lawful authority, is a usurpation of power, and the illegal exercise of a franchise, and is void. The grantees who insist upon the right to exercise the powers and privileges thus granted, were properly, perpetually enjoined. There are some provisions of statutory law, not referred to by the counsel of either party, which may possibly be thought to favor the proposition, that this grant is to be construed, as it would be if it expressly reserved the power to at any time modify or repeal it.
The 274th section of the consolidating act of 1813, provides that all laws and ordinances of the said Mayor, Aldermen, and Commonalty, in Common Council convened, may continue in force three years, unless sooner repealed, or enacted for a shorter period, and declares that any ordinance or part of an ordinance “ passed in pursuance of the powers hereby granted, may at any time be repealed by the legislature.” (2 R. S. 447, § 278.)
In 1837, an act was passed, to the effect that, “ all ordinances heretofore passed by the Common Council of the city of New York, and now in force, and all ordinances hereafter to be passed by the said Common Council, shall remain and continue in force, until the same shall be repealed. The same act repealed so much of § 278 of the act of 1813, as is repugnant to the section above quoted.
It is obvious, as we think, that it was not the purpose of these sections to authorize the Corporation to annul at pleasure valid contracts, which it was competent to make. If the Common Council should by resolution contract with any one to erect a public building, and if authorized to contract directly, instead of through the head of an executive department, it cannot be contended that these sections render it competent for the Common Council to rescind the resolution when the other *154 party is not in default, without being liable to damages for the breach of it, nor that the legislature attempted to reserve a powér to rescind its ordinances, which are in the nature of contracts. On such a construction the legislature may repeal this resolution' at any time, or abrogate any right whatever conferred upon any and every person with whom a contract has been made, when the assent or agreement on the part of the Corporation is evidenced by an ordinance.
The word, ordinance or law, as used in those sections, must mean ordinances regulating the duties of the citizens with respect to some subject or matter affecting all, or particular classes, or kinds of business and other matters general in their character, such as those which relate to the police, the security, the health, and cleanliness of the city.
But upon no construction can they obviate the ’fifth, sixth, seventh, and eighth, of the objections above specified.
The only question remaining is, was the order of the 9th of November, 1853, an error, which entitles the defendants to a reversal of the judgment? An appeal was taken from that separately, but was not brought on to be argued prior to the argument of the appeal from the judgment. As a separate appeal it would be heard as a non-enumerated motion. It is an appeal taken by virtue of § 349 of the Code, and not by virtue of § 348, and viewed as a separate and distinct appeal, it would not be a calendar cause, but would be heard on the days for hearing non-enumerated motions. (Rules of Supreme Court of 1852, Nos. 27, 32, 33 ; Code, § 470.)
But on an appeal from a judgment the court may review any intermediate order involving the merits and necessarily affecting the judgment. (Code, § 329.) The court may reverse, affirm, or modify the judgment or order appealed from, in the respect mentioned in the notice of appeal, as to any, or all, of the parties (id. 330).
The court may, before or after judgment, “ amend any pleading, process, or proceeding, by adding or striking out the name of cmy pcvrty" (§ 173). “ Whenever any proceeding taken by a party fails to conform in any respect to the provisions of the Code, the court may permit an amendment of such proceeding, so as to make it conformable thereto” (id. 175).
*155 “ The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings, which shall not affect the substa/rvbidl rights of the adverse party ; and no judgment shall be reversed or affected by reason of such error or defect” (id. 176).
So far as the merits of the controversy depend upon considerations growing out of the terms and provisions of the grant, the competency of the Common Council to make it, the necessary legal consequences of assuming to give the authority and create the rights which it purports to confer, and the inevitable results of an exercise by the grantees of the powers granted, it is to be observed that it was of no importance to the defendants at what stage of the proceedings the attorney-general was made a party. The resolution creating the grant, and the instrument by which it was accepted, are spread out upon the record, and there is no controversy or question made by the pleadings, or otherwise, as to their terms. Whether the action had been originally brought by him alone, or by him on the relation of Davis and Palmer, these undisputed facts would present precisely the same point for adjudication, so far as the competency of the Common Council to make the grant, and its legality and its effect upon the rights of the people of the city and county of New York are concerned. If all are proper parties, and the judgment is right upon the merits, there is no defect in form. If right upon the merits, and the attorney-general alone is the only proper party plaintiff, it should not be reversed in toto (§ 176). No substantial right was affected by allowing an unnecessary party plaintiff to appear as such upon the record. (The People v. Trustees of Geneva College, 5 Wend. 220.) If the attorney-general was unnecessarily made a party, it was not an error or defect affecting the substantial rights of the adverse party. It did not alter the issues between the parties, or the trial, in respect to the matters upon which the court at special term decided the controversy. (2 R. S. 425, § 8.) The order allowing him to be made a party did not involve the merits, nor necessarily nor at all affect the judgment, if it can be upheld upon any of the grounds upon which it was decided, or upon which we have concluded it should be affirmed.
*156 The position taken in the earlier proceedings had in this action, and when among the other facts stated in the complaint, were allegations, that the railroad would be a public nuisance specially injurious to Davis and Palmer as property owners, was that the attorney-general was a necessary party plaintiff. Ho one denied that he was a proper party. This court held that he was not a necessary party, in an action to restrain a public nuisance, which would be productive of special pecuniary injury to the individuals who commenced the action.
If he had been a party at the time the action was commenced, the suit would have been throughout in the condition as to parties which the defendants, during- the proceedings in the contempt cases, contended was the only one consistent with technical regularity.
The Court of Appeals, in the opinion delivered in this case, say, “ we are entirely satisfied that the decree of a court of equity, restraining a public nuisance, is not void even though the attorney-general be not plaintiff, and though no special injury to the actual plaintiff is averred. It is quite possible that such a decree would be erroneous, perhaps even very clearly wrong, but it would not be void, and the party, who was dissatisfied with it, would be compelled to seek his remedy by appeal, and not by setting at defiance the authority of the court.”
Suppose in this case, it had been found as matter of fact, that the railway would have been a public nuisance, but no special injury to the actual plaintiffs, and on that finding a perpetual inj unction had been decreed; would it not have been entirely competent for the court below, even after judgment and before an appeal taken, to have allowed an amendment adding the attorney-general as a party plaintiff, under § 113 of the Code 1 It would not affect the form of the issue, in which the action had been decided, the evidence that could be given under it, nor the form or place of the trial, whether he had been originally a party plaintiff, or was made such at any subsequent stage of the proceedings.
An action to annul the grant of a franchise made by a municipal corporation, if exercised in conformity with the powers and privileges conferred by the terms of the grant, would *157 interfere with rights conferred by statutory law upon every one residing or travelling within the territorial limits of the corporation, is one in which not only every corporation is directly interested, but is one in the event of which the people of this state are also interested.
If we are to look to the Code alone, and to pre-existing statutory ,law not repealed by it, to determine whether all who now appear as plaintiffs to the record are proper parties, it will be manifest that all of them are.
An ordinary proceeding, by which a party prosecutes another for the protection of a right, or the prevention of a wrong, is a civil action. (Code, § 2.) Every action must be prosecuted in the name of the real party in interest (Id. 3); and when the question is one of a common or general interest of many persons; or when the parties are very numerous, and it may be impracticable to bring them all before the court, one or more may sue or defend for the benefit of the whole (Id. 119). The questions in this case, are questions of common interest to every citizen residing within the city, and affect all the corporators alike. The original plaintiffs are citizens, residents within the city, and corporators of said city. This is alleged in the complaint, and not denied by either answer of any of the defendants. They are also alleged to be owners of real and personal estate, and tax payers; and while the grantees of the railway put these allegations in issue by denying that they have any knowledge or information sufficient to form a belief as to these facts, we understand that the judge who tried the cause, found these allegations in favor of the plaintiffs. He allowed the plaintiffs an election to have an issue for a jury upon the question,— “ whether the contemplated railroad would be a public nuisance specially injurious to the plaintiffs”—which we think he would not have done, if these facts had not been satisfactorily proved; and no point has been made on this appeal, that it was not proved that the plaintiffs owned in fee the real estate situate on Broadway—as the complaint alleges.
At all events, they were citizens, residents, and two of the corporators of the city. They were proper parties. The complaint, by its terms, states the action to be brought, “ as well on their own behalf as on behalf of all other corporators and *158 tax payers of the city of Hew York, who may he affected by the several matters ” therein complained of. In that respect, it conforms to § 119 of the Code.
The Revised Statutes make it the duty of the attorney-general to prosecute or defend all actions, in the event of which the people of this state shall be interested. (1 R. S. 179, § 1.) This is one in the event of which the people of this state are interested. The people could not be affected by any judgment in this action, in favor of the defendants, unless parties to it. The attorney-general was not only a proper party, but was a necessary party, to a complete determination of the controversy. In such a case it was proper that he should be made a party, and the Code contains ample provisions for making all necessary amendments to effect that object. (Code, §§ 122 and 173; Jennings v. Spring, 1 Bailey’s Equ. R. 181.)
If technically accurate phraseology required the amendment to be in such form, in its description of the parties as they would stand upon the record after the amendment made, as to state that “The People of the State of Hew York, by the attorney-general of the said state, on the relation of Thomas E. Davis and Courtlandt Palmer, complain to this court, the said Davis and Palmer, as well in their own behalf,” &c., we will intend that it was so made, as nothing to the contrary appears. The object of the amendment was to make the people of the state a party, and, in common parlance, to effect that result the attorney-general, as representing the people, is made a plaintiff in the action. A mistake in the name or description of a party may be corrected after judgment (Code, § 113), and it is not an error for which a judgment can be reversed. It affects no substantial right of the adverse party, especially when the description discloses with sufficient distinctness to leave no reasonable doubt who is designated by it.
There is an obvious propriety in all such cases in joining with the people as plaintiffs responsible individuals, who have an interest in the right sought to be'protected, or in preventing the' threatened wrong. If the action shall prove to have been brought on an erroneous assumption as to the facts, or the legal consequences of facts accurately stated, the individuals on whose relation or information it was commenced will be liable for the *159 costs, and the people will not be liable, except upon a failure to collect them by execution against the private parties. (Code, §§ 319, 320.) The Attorney-General v. The Mayor of Dublin, 1 Bligh N. R. as to the object of uniting private persons with the attorney-general as plaintiffs.
The union of individuals with the people, as plaintiffs, is in accordance with the express provisions of the Code, in relation to actions substantially like this in their nature, and the object is to exempt the state from the costs in an unsuccessful litigation.
After this grant had been made, if the view which we, have taken of the character of the resolution creating it he correct, the attorney-general, upon his own information, or upon the complaint of Davis and Palmer, without the previous order of any court, could have brought an action against the corporation on the ground that it had “ illegally exercised a franchise.” (Code, §§ 432 and 428.) The grant of the privileges conferred on Sharpe and others, if the Common Council was incompetent to make it, was an illegal exercise of a franchise and a usurpation of power. (The People v. Utica Ins. Co., 15 I. R. 387; The People v. Trustees of Geneva College, 5 Wend. 217; Commonwealth v. Fowler, 10 Mass. 290, 295, and 301.)
The attorney-general is not required by § 432 to bring the actions enumerated in it in any particular court. But at the time this action was commenced no grant had been made. The action was brought to protect the rights that would be invaded, and prevent the wrongs that would be inflicted by its passage, and the exercise of the powers it purported to grant, by restraining its passage. After it had been passed in defiance of the injunction of the court, the persons in whom the rights and powers it created and conferred were vested, were also made parties to restrain them from acting under it, and to conclude them by any judgment that might be rendered.
If the view; taken of the grant be correct, its passage and an exercise of the powers it conferred would be an illegal invasion of the rights of every corporator of the city, and of every citizen of the state. To protect these rights and prevent the wrong of such an invasion of them, this action was brought. The Code gives a remedy by action to protect the right and prevent the wrong. The suit is prosecuted by the people, who are inte *160 rested in its event, and by private parties in behalf of themselves and others similarly situated, who would be more immediately and constantly affected by the wrong than citizens not residing within the city. The action was commenced by the service of a summons, the mode of proceeding prescribed by the Code. The plaintiffs are competent to sue, they have commenced an action provided by the Code, and in the manner directed by it (§ 127). It is brought against the party that threatened to do the wrong sought to be prevented. That party is a municipal corporation, one of whose privileges, secured to it not only by the Dongan and Montgomery charters, but by the statutes and constitution of this state, is that “ of suing and being sued in all courts in like cases as natural persons.” (Art. 8, § 3 of Constitution, 1846 ; 1 R. S. 599, § 1, sub. 2.)
The Court of Appeals having decided that the jurisdiction of this court over actions against this corporation “ is as wide as the definition of an action under the Code, and that is defined to be ‘ an ordinary proceeding in a court of justice by which a party prosecutes another party for the enforcement or protection of a right, the redress or prevention of a wrong,’ ” it would be out of place to enter upon the consideration of the extent of its jurisdiction.
The right asserted, and recognised and protected by the judgment appealed from, could only have been enforced by action. The only full and adequate remedy against the wrong sought to be restrained consisted in preventing the wrong. The judgment appealed from secures redress by inhibiting the wrong. Unless a judgment which merely protects undoubted rights, and prevents the commission of acts which would be clearly wrong, should be reversed by reason of some exemption of the defendant from that control to which all natural and all other artificial persons are subjected, which has not been pointed out, we perceive no grounds for disturbing the judgment of the special term. The judgment appealed from must, therefore, be affirmed with costs.