Cochran v. McCleary.

Reversed.

COCHRAN *et al.* v. McCLEARY, Mayor.

1. **Corporation municipal:** RIGHT OF MAYOR TO PRESIDE. The mayor in cities of the second class organized under the general incorporation act (Rev., ch. 51) is not, *ex officio*, a member of, nor has he any right to preside over, the city council.

2. ——— COUNCIL. The council of cities of the second class is composed exclusively of the trustees selected under section 1093 of the Revision, and elects its own presiding officer.

3. ——— IOWA CITY. The right of the mayor of Iowa City, possessed under its previous special charter, to preside over the council, is taken away by the general incorporation law (Rev., ch. 51), under which that city subsequently organized.

4. **Office and officer:** DE FACTO ALDERMAN. The acts and votes of a *de facto* alderman are held valid in all collateral proceedings.

5. ——— QUO WARRANTO: FRANCHISE. The right to preside over the meetings of a city council is a "*franchise*" within the meaning of chapter 151 of the Revision of 1860, sections 3732 and 3743, the right to which may be tested by an information in the nature of a *quo warranto*.

6. ——— CONTEST OF RIGHT TO. The right to a public office or franchise cannot be determined in equity upon an original bill for an injunction. *Quo warranto* is the proper proceeding.

| 22 | 75 |
| 87 | 575 |
| 22 | 75 |
| 107 | 182 |
| d107 | 184 |
| 107 | 185 |
| 22 | 75 |
| 114 | 100 |
| 22 | 75 |
| 116 | 99 |
| 22 | 75 |
| f132 | 489 |

*Appeal from Johnson District Court.*

THURSDAY, APRIL 11.

GENERAL MUNICIPAL INCORPORATION ACT: MAYOR OF CITIES NO RIGHT TO PRESIDE IN COUNCIL: RIGHT OF PRESIDENT PRO TEM. TO PRESIDE: QUO WARRANTO: NATURE AND EXTENT OF REMEDY: INJUNCTION—WHEN.—Defendant is

Cochran v. McCleary.

admitted to be the duly elected, qualified and acting mayor of Iowa City, a city of the second class, organized under the general incorporation act. Chap. 51 of the Revision.

This appeal presents these questions :

1. Is the defendant, as mayor of the city, entitled by law, in virtue of his office, to preside over the meetings of the city council?

2. Is the said M. B. Cochran, as president *pro tempore*, entitled to preside over the meetings of the council ?

3. Ought the injunction, which was granted against the defendant, McCleary, to have been dissolved on his motion made for that purpose ?

The better to understand these questions it is necessary to state certain other facts, either admitted by the pleadings or shown by the affidavits.

1. *In relation to the right of McCleary to preside.*

It is admitted, as before stated, that McCleary is the duly elected, qualified and acting mayor of Iowa City— a city of the second class. And McCleary claims his right to preside over the corporate meetings, solely in virtue of his being the mayor of the city. He also disputes the right of Cochran to preside, denying that he has been *legally* elected president *pro tem.*

2. *The facts in relation to Cochran's right to preside, are as follows :*

The city council consists of eight members, two from each of the four wards. Cochran's right to preside is based upon the following acts of the city council :

1. On the 19th day of August, 1865, the city council passed an ordinance, providing, "that, at the first regular meeting after the annual election of city officers, or as soon as practicable, the city shall elect the following officers, to wit : city clerk, street commissioner, * * *,

Cochran v. McCleary.

also a president *pro tem.*, *who shall preside at the meetings of the city council during the year.*"

2. On the 6th day of April, 1866, the council (according to the official record of the proceedings kept by the clerk) met in regular meeting, "all the members being present. Alderman Close moved to elect Alderman Cochran president *pro tem.* The ayes and nays were demanded. The roll was called, and the motion adopted as follows : Ayes—Close, Cochran, Davis, Lewis and Redhead (5). Aldermen Holtz, McCall and Vogt (3) did not respond to the call of their names. Alderman Cochran was declared president *pro tem.*, and he came forward and took his seat and called for the reading of the minutes of the last meeting. At this stage of the proceedings, the mayor (McCleary) ordered the marshal to remove the president (Cochran) from his seat. The marshal attempted to force the president from his seat, which caused great confusion and disorder. Many persons not belonging to the council rushed into the space occupied by said body, and the excitement was so great that a general riot seemed imminent. At this juncture, on motion of Alderman Davis, the council adjourned." *Extract from the Journal of the City.*

The defendant, McCleary, in his answer, claims that Cochran was not *duly* elected president *pro tem.*, because he did not receive a majority vote of the council, in this : That said *Redhead*, without whose vote he (Cochran) would not have had a majority, was not a *legal* member of the council ; that Redhead, though present and assuming to act, was not, but one Vanfleet was the legally elected alderman. The claim that Vanfleet, and not Redhead, was the member *de jure*, is based upon the following facts, to wit :

At the regular annual election in 1865, Vanfleet and Redhead were, by the council (March 16, 1865), duly

" declared elected trustees of the second ward of Iowa City ;" but the council failed to declare the term of their election. At a meeting of the city council, held March 14, 1866, the council, having before failed to ascertain or fix the term of the said aldermen, ordered them to draw lots to determine which should hold over for another year. "Lots were prepared and drawn, and the two years' term fell to Mr. Redhead, and the president (so reads the official record) declared that Mr. Redhead was entitled to hold over as the trustee of the second ward for the ensuing year." Cochran was elected at the regular election in 1866, as one of the trustees of the second ward, and the said Redhead and Cochran were the acting members from that ward at the time of the disturbance in April, 1866, out of which the present proceeding arose. Vanfleet was not at this time *de facto*, a member, had no seat and was not recognized as entitled to a seat, by any action of the council.

3. *Facts concerning the nature of the present proceeding.*—This proceeding was instituted in April, 1866, and was originally brought in the name of " the State of Iowa on relation of C. R. Scott, as district attorney, against Geo. W. McCleary, mayor of Iowa City."

The original petition seems to have been an information in the nature of a *quo warranto*. It alleges that the defendant, unlawfully and with force and violence, has presented himself and claimed the right, as mayor of said city, to preside at the meetings of the council, and to vote as a member thereof ; that defendant has prevented Cochran, the duly elected president *pro tem.*, from presiding ; that each commanded the marshal to arrest the other ; that a general disturbance and row have ensued from these acts of the defendant ; that, in consequence, the council has been compelled to adjourn without transacting its business, and that defendant declares

his determination to insist upon his right to preside. Judgment was asked, "ousting defendant from his usurped seat as a member and president of said city council, and for costs and damages, and a *writ of injunction*, restraining defendant from holding his seat as president of said council or as a member thereof, and from presiding at the meetings of the council, and from participating in said meetings as a member or officer thereof, and on final hearing that the injunction be made perpetual."

On the 10th day of April, 1866, on motion of the district attorney, an *ex parte* injunction was granted by the judge of the District Court.

Defendant soon afterward filed an answer, in which he admitted that he was mayor, and that by virtue thereof, he had claimed the right to preside at the meetings of the council; alleged that he was and that Cochran was not entitled thus to preside; denied that his acts were wrongful or unlawful, but, on the contrary, alleged that the claim of Cochran was unfounded, and his acts illegal.

Defendant filed a motion to dissolve the injunction, because improperly granted in matter of law and fact; because granted *ex parte;* because there is a remedy at law; and because the answer denies the material averments of the petition.

The record of the court recites that, after having heard the arguments of council upon the motion to dissolve the injunction, "upon intimation of the judge, that *quo warranto* would not lie, and that the remedy, if any, should be by injunction as an independent means of relief, by agreement and consent of parties, leave is given to amend petition and verify same, without prejudice to the present writ. Petition was thereupon amended as to parties and verified; wherefore it is ordered, that the motion to dissolve the injunction be overruled, and

that said injunction stand and be made perpetual; to which defendant excepts."

The amendment consisted in making Cochran, Davis, Lewis, Close and Redhead (five of the eight aldermen of the city), parties plaintiff. The other aldermen were not made parties, either as plaintiffs or defendants. The city was not a party. One of the aldermen (Davis) verified the petition originally filed on the relation of the district attorney. No additional facts were stated.

From the order of the court refusing to dissolve the injunction and making the same perpetual, the defendant McCleary appeals.

*J. Y. Blackwell* and *Fairall & Boal* for the appellant.

*Cornell & Bro.* and *W. E. Miller* for the appellees.

DILLON, J.—I. As TO DEFENDANT'S RIGHT: The legal question here presented is: Has the mayor in cities of the

<small>1. CORPORATION MUNICIPAL: right of mayor to preside.</small> second class, organized under the general incorporation act (Rev., ch. 51), a right, in virtue of his office, to preside over the city council, and to vote therein? Upon a careful examination of the chapter, it is our opinion that the MAYOR has no such right. We briefly assign our reasons.

Each ward elects two trustees (§ 1093), and the board of trustees constitutes and is denominated the "city council." § 1091. "The *trustees* shall assemble together and organize the city council, and a majority of the whole number of *trustees* shall be necessary to constitute a quorum," etc. § 1073. "The trustees shall elect *from their own body* a president *pro tempore.*" Id. Municipal officers shall receive such compensation "as the *trustees* shall prescribe by ordinance," etc. § 1095. "The compensation of the *council or trustees* shall not exceed," etc. Id. "Any member may be expelled or removed by a

vote of two-thirds of all the *trustees* elected to the city council," etc. "Any officer, etc., may be removed by a two-thirds vote of all the trustees elected," etc. § 1101; see also §§ 1102, 1134. As respects *towns*, the law is express "that the *mayor*, *recorder* and *trustees* shall constitute the council" (§ 1081); and it is expressly provided that the mayor shall preside at corporate meetings. § 1082.

As respects *cities*, there is no such provision. The mayor is not declared to be a member of the council, nor even directed to sign ordinances; these are to be signed by "the presiding officer of the council." § 1133. In the enumeration of the duties of mayor, that of presiding over meetings of the council is not mentioned. § 1091.

Taking these various provisions together, it seems quite clear that the council of the city is composed exclusively 2. —— council. of the trustees; that they elect their own presiding officer; that the mayor is not a member of the council, and has no right to preside, sit, or vote therein.

3. —— Iowa City. It is proper here to notice the several objections made by the defendant to this view.

1. It is claimed that the previous special charter of Iowa City, vested the legislative power of the city in a council, consisting of a mayor and aldermen, and that the charter declared that the mayor, when present, should preside and give the casting vote in case of a tie. Act January 24, 1853, ch. 63, §§ 3, 13.

It is then claimed that chapter 51 of the Revision does not repeal or supersede or conflict with this portion of the prior charter, therefore (the argument is) these portions of the prior charter still remain in force. We have just seen that under the Revision (ch. 51), the mayor is not a member of the council and has no right to preside at its meetings.

The provisions of the two acts are therefore in conflict,

VOL. XXII.—11

Cochran v. McCleary.

and of course the latter act governs; and the right of the mayor under the special charter, as a member of the council, and to preside, is not saved by section 1140, because, first: this is not one of "the special acts" therein referred to; and because, second, the matter of the two acts are "inconsistent."

It is argued by the defendant, second, that the provision that the city council shall elect from their own body a president *pro tempore* (§ 1093) implies that there must be a permanent president. It seems to us that there is no such necessary implication, certainly no necessary implication that such permanent president is and must be the mayor.

It is undoubtedly true that, in England and generally in this country, it is commonly one of the duties of the mayor to preside at corporate meetings. But in England, prior to the Municipal Corporations act of 1835, the power and duties of mayors, including the right to preside, depended upon charters, regal and parliamentary, usages, customs, etc.*

But in 1835 the municipal corporation act, which was intended to sweep away the vast and perplexing mass of

---

* "MAYOR. — The chief governor or magistrate of a city or town corporation. * * * The powers and duties of a mayor or other head officer of a corporation depends, in general, upon the provisions of the charters or prescriptive usage of the corporation, or the express provisions of an act of parliament.

"It is *commonly* one of his duties, as well as his particular privilege, to preside at corporate assemblies." 4 Jacob's Law Dict., 264, 265.

"The chief or executive magistrate of a city. It is generally his duty to cause the laws of the city to be enforced and to superintend inferior officers. But the power and authority which mayors possess, being given to them by local regulations, vary in different places." 2 Bouv. Law Dict , 150.

As to powers and duties of mayors in England, under the municipal corporation act of 1835, see Grant on Corp,. pp. 341, 357, 423. The Iowa statutes (Rev., § 1091) define the duties of this office thus: "The mayor of the city shall be its chief executive officer and conservator of the peace," etc., further-prescribing his duties, but not enumerating among them the right to sit in or preside over the city council.

Further, as to the nature of office of *mayor*, see *Waldo* v. *Wallace*, 12 Ind., 569, 577, 597; *S. C.*, 14 Id., 93.

special charters, grants, usages and customs, and to reduce all the municipal corporations in England and Wales to an uniform model (see Grant on Corp., 341), made express provisions that the mayor should preside at corporate meetings, if present. Id., 357, 423. In that country the matter is now regulated by this statute.

In this country the doctrine has been recognized that corporations, public or private, could be created only by act of the legislature, and they and their officers had and could exercise only the powers granted to them either expressly or by implication.

If it had been true that in England mayors had, in virtue of their office, a prescriptive or uniform right to preside at corporate meetings, it would not follow that they would necessarily have that right in this country. Whether corresponding officers would here possess this right or not would depend upon a construction of the charter, organic law, or constituent act of the corporation.

And in the case at bar, the law, as we have seen, by fair if not necessary implication, *excludes* the right.

And the council may elect, at each meeting, a *pro tem.* president, or they may, as they did, under their power to pass rules and by-laws, elect from their own body a permanent president; that is, one who shall, when present, preside during the year. In this connection it is proper to observe that, in *ex parte Strahl* (16 Iowa, 367) there is *arguendo* an observation in the opinion delivered by the writer, that "the mayor may preside in the council, and, if there is a tie, may give the casting vote."

This was not necessary to the decision of that case, which was undoubtedly rightly determined upon its facts, and the above observation was caused by the fact that, in that city, probably by virtue of an ordinance, the mayor did preside without objection. The right (under chapter 51) to preside was a point to which the attention

of the court was not called, nor did the court then examine the statute with the view of determining whether the mayor had the right to preside over the council.

II. As to the right of the president pro tem.—From the foregoing it will be seen that we are of opinion that

4. Office and officer: de-facto alderman.  the council might, by a majority vote, elect Alderman Cochran president *pro tem.*, and that, in virtue of such election, he ought lawfully to preside over the council. It is a familiar principle of law that the acts and votes of a *de facto* alderman are valid, certainly in all collateral suits and proceedings. *Scovill* v. *Cleveland*, 1 Ohio, 126; 5 Hill (N. Y.), 616; 17 Ohio, 143; 6 Wend., 422; 9 Johns., 147; 16 Iowa, 369; 7 Cow., 23; 21 Pick., 75; *Decorah* v. *Gillis*, 10 Iowa, 234.

It follows that Mr. McCleary cannot, *in this suit*, object to the validity of Alderman Cochran's election as president *pro tem.*, and base that objection on the alleged fact that Alderman Redhead was not *de jure* the alderman, but that Vanfleet was. The latter had no seat, and there is nothing to show that he was even present claiming a seat, or that he had ever claimed it after it was determined by lot that Redhead should hold the long term. Rev., § 1093. It seems that on the ballot cast for Mr. Redhead at the election by the people, the words "short term" were written above or opposite his name, and the words "long term" opposite the name of his associate candidate. But Vanfleet ran on a different ticket, and above or opposite his name there were no words indicating for what period or term either he or the other candidate on the same ticket should serve.

Beside, the term of service, under section 1093, is to be determined by the city council, by lot. This is certainly so at the first election, and we have no evidence that the election now in question (that of 1865) was not the first

one. But we place our decision of this part of the case upon the ground that Mr. Redhead's acts as a *de facto* officer, were valid.

The council had adjudged him to be the member (§ 1093), and his right as such can only be determined against him by a direct proceeding for that purpose. And the present was not a proceeding instituted against Redhead to test his right to sit and vote as an alderman.

III. As to the remedy against the defendant. — The defendant had, as we have seen, no right, by virtue of his office as mayor, to preside over the meetings of the council. That he supposed he had such right, we have no reason to doubt, but this would not make his claim to preside over and act as a member of the council any the less unfounded. Insisting that he had the legal right to preside, the defendant, against the wishes of a majority but probably in accordance with the wishes of a minority of the council, sought to exercise this right by force: so the president *pro tem.* claimed and sought to exercise his right to preside by force. Now, the question presents itself, what is the proper remedy? By what legal remedy can the defendant have his claim of right to preside determined? By what legal remedy can the claim of right of the president *pro tem.* be asserted and enforced?

We make no reference to the *inherent power* of the *council* as a legally organized deliberative and legislative body. It might, if it had the power to overcome the resistance offered, cause the arrest of the mayor, who was intruding himself into their body, the same as it might cause the arrest of any other intruder or usurper.

But the inquiry which now concerns us is as to the proper legal mode to test the question, whether the mayor or the president *pro tem.* had the legal right to preside. In England, and in the different states in this country, the law, solicitous to furnish a

quo warranto: franchise.

remedy for every invasion of legal right, has provided that of *quo warranto* or an information in the nature of a *quo warranto*, to determine the title of an *officer to his office*, and to determine the right of any person or corporation to exercise a *public franchise*.

Unless the law is altered by our statute, it is perfectly well settled that questions of this character cannot be tried and decided in any collateral or indirect proceeding, as, for example, by a bill to enjoin. And the court of chancery goes so far as to hold that it will not interfere, before a trial at law, in favor even of an officer *de jure* against an illegal claimant, by enjoining the latter from exercising the functions of the office. Upon this subject the authorities speak a uniform language. *Tappan* v. *Gray*, 7 Hill (N. Y.), 259, affirming *S. C.*, 9 Paige Ch., 507; *Markle* v. *Wright*, 13 Ind., 548; *Hullman* v. *Honcomp*, 5 Ohio, 237; *People* v. *Cook*, 4 Seld., 67, affirming *S. C.*, 14 Barb., 257; *Lans* v. *Oliver*, 4 Abb. Pr., 121; *Mayor* v. *Conner*, 5 Ind., 171; Id., 73; *Mosley* v. *Alston*, 1 Phillips, 790; *Foss* v. *Harbottle*, 2 Hare, 492; *Peabody* v. *Flint*, 6 Allen (Mass.), 52; *Lord* v. *The Governor*, etc., 2 Phill., 740; *Hagner* v. *Heyberger*, 7 Watts & Serg., 104; *People* v. *Carpenter*, 24 N. Y., 86; *People* v. *Draper*, 15 Id., 532; *Mickles* v. *Rochester City Bank*, 11 Paige, 118; and see, in *The People* v. *Utica Ins. Co.* (2 Johns. Ch., 371), Chancellor KENT's elaborate opinion, holding that chancery had no jurisdiction to restrain a corporation from usurping and illegally exercising the public franchise of banking, the remedy being at law by an information in the nature of a *quo warranto*. *The People* v. *Same* (*quo warranto*), 15 Johns., 358; *Commonwealth* v. *Bank*, 28 Pa., 389; (*quo warranto*), Id. (in matter of same bank in equity), p. 379.

Now our statute (Rev., ch. 151) on the subject of informations, finds its original in the statute of 9 Anne,

Cochran v. McCleary.

chapter 20. Ours, however, is broader, and extends to cases not embraced in the English act. Our statute (§ 3732) provides that, "An information may be filed against any person unlawfully holding or exercising *any public office or franchise* within the State, or any office in any corporation created by the laws of this State," * * * or "when corporations exercise powers not conferred by law."

Plaintiffs claim that the statute does not apply, because they do not deny that the defendant is mayor, and do not question his right to discharge the appropriate duties of that office. On the contrary, they admit that the defendant is mayor, and say they only seek to restrain him from interfering with matters which do not pertain to his official duties or powers.

The statute of Anne contains the same words, " office " and "franchise," as ours, although these words are used in our statute without any restriction to municipal franchises or officers. Our statute further provides that, "When several persons claim to be entitled to the same *office* or *franchise*, an information may be filed against all or any portion thereof, in order to try their respective rights thereto." § 3743, and see §§ 3744–5, as to form of judgments.

It may be conceded that the present is not the case of a contest for an " office," and that the right of presiding over the council is not the "holding and exercising of a *public office*," within the meaning of our statute (chap. 151) of *quo warranto.* §§ 3732, 3743, *supra.*

But the question remains, whether the right to preside over the meetings of the council is a " franchise," within the meaning of the same statute.

If it is, and if the claim to exercise and hold it is unlawful, then an information under chapter 151 is the proper legal mode to exclude the illegal claimant from the usurped right.

Cochran v. McCleary.

We have examined the English and American adjudications with great care, to see whether the remedy by *quo warranto* would lie to test the right of a person to preside over a public corporation. And upon the subject we have no doubt. The authorities are uniform to the point that, to determine a question of this character, *quo warranto* is the proper, if not, indeed, the only legal remedy. We cite some of the more pertinent authorities in a note, some of which, it will be observed, are directly in point.*

---

* *Reynolds* v. *Baldwin*, 1 La. Ann. R. 162 (1846) is specially applicable to the case at bar, as to the form of remedy. It was a writ of *quo warranto* to test the right of the recorder, who was, *ex officio*, president of the council, to vote in cases where there was not a tie. The facts were these: The charter provided "that the aldermen shall form the city council, of which the recorder shall, *ex officio*, be president, but shall have no vote except a casting vote." The recorder, presiding at a regular meeting of the council, ruled a certain resolution out of order. An appeal from the ruling was taken, six voting to sustain his decision, and seven voting against it; "whereupon," says the report, "the recorder voted with the minority, asserting his right to do so under the second section of the act dividing the city into three municipalities, which makes, in his opinion, the recorder a component part of the council, and thus gives him, by implication, the power of an alderman. By his vote his decision was sustained. The seven aldermen who voted in the negative instituted proceedings in the nature of a *quo warranto* to test the legality of the vote given by the recorder, and, if it should be found illegal, to obtain an order forbidding him to exercise hereafter the rights, duties and privileges of an alderman. The defendant excepted to the petition, writ and proceedings, on the ground that it is not a case in which a writ of *quo warranto* can or ought to issue; contending that this writ can be resorted to only in cases of *usurpation of office*, and because the defendant, so far from having usurped *the office* of alderman, has, from the beginning, disclaimed any title to that office, or any intention to usurp or exercise the rights, duties and privileges thereof, and simply considers it his right" [as did the appellant in the case at bar], "in virtue of his own office as recorder to vote in the deliberations of the council." The statute gave the court power "to issue writs of *quo warranto*, etc., according to the rules of the common law." The court held that, although the defendant had not, according to the technical distinctions of the common law, usurped *an office*, he had, nevertheless, usurped a *franchise ;* that *quo warranto* was the proper remedy, and judgment, in which the court was "unanimous, clear and decided," was given against him.

So, an information in the nature of *quo warranto* may be granted at common law for illegally holding a court of record within a charter borough, and presiding therein in the absence of bailiffs, the defendant not being one of them. The reason is, that this is an usurpation of the *franchise* of holding the court. *Rex* v. *Williams*, 1 Burr. 402 ; *S. C.*, 1 Wm. Bl. 93 ; *S. C.*, 2 Ld. Kenyon, 68; correctly digested and stated, 2 Kyd, 429 ;Willcock, 462.

And Mr.Willcock, speaking of the cases in which the attorney-general or public

Cochran v. McCleary.

The adjudications proceed upon this reasoning: a public corporation can only emanate from proper authority,—in this country from the legislature. The right to preside therein is a legal right conferred by law. This right is a "franchise" or privilege, given by law, and, therefore, if invaded, the law affords a means of redress, a remedy, and this remedy is by *quo warranto*, or information, in that nature. Angell and Ames Corp., § 737, and authorities cited in note.

It follows from the preceding observations that we are of opinion that the District Court erred in holding that an information under chapter 151 was not, and that an injunction, as an independent means of relief, was, the proper remedy. The statute (Rev., § 3773), authorizes the granting of an injunction only "in accordance with the rules heretofore observed except as herein modified."

The authorities above cited are conclusive, that, according to the general rules of courts of equity, an injunction is not allowed in cases of this character.

Have those rules been "herein," by the Revision, modified?

It is claimed by the plaintiff that these rules have been modified by chapter 155, entitled "prohibition in an action by ordinary proceedings."

It is not necessary to say, in this case, that an unfounded claim of right to preside over a public corporation, and

prosecutor may file an information in the nature of *quo warranto*, lays down the law in this language: "And he may file it against a person, who is *admitted* to be a legal, corporate officer, to show by what title he holds a franchise, which he *assumes to exercise in his official capacity* : as, if the mayor assume a right to admit freemen without the assent of the rest of the body corporate." Willc. on Munic. Corp., 456; pl., 337; referring to *Rex* v. *Hertford*, 1 Salk., 374; *S. C.*, 1 Ld. Raym., 426; approved, commented on and explained by TILGHMAN, Ch. J., in *Commonwealth* v. *Arison*, 15 Serg. & Rawle, 130; and see similar cases, cited by Mr. Kyd (2 Kyd Corp.), pp. 417, 419. Further, as to meaning of "franchise," see Comyn's Dig. title, *quo warranto ;* 15 Serg. & Rawle, 130, per TILGHMAN, Ch. J.; *People* v. *Ins. Co.*, 15 Johns., per SPENCER, J.; *People* v. *Geneva College*, 5 Wend., 211; 21 Id., 235.]

attempts; from time to time, forcibly, to insist upon this right, resulting in entire interruption of the meetings of the corporation and leading to disturbances of the peace, would not be such an "injury," and such a repetition of it as to be embraced in the chapter (155) above mentioned. Courts would be the more inclined to give the remedial chapter a liberal construction, because our statute makes informations under chapter 151, triable in the ordinary manner. § 3738. Tried in this manner, the proceedings, instead of being summary or even speedy, would, in most cases, be so delayed as to prevent any determination of the case within the usual period of an officer's term; and meantime, an usurper, or intruder, keeps the rightful officer at bay, and enjoys the emoluments and discharges the duties of a place which belongs to another.

And we venture most respectfully to suggest to the legislature that it should so amend the law as to provide for the speedy determination of causes of this character; preliminarily, it might be in vacation, and finally at an early day in term. This might be done by requiring the issues to be made up, and the testimony taken in vacation.

Admitting that chapter 155 might embrace such a case as the present, the injunction therein contemplated is only ancillary to the main proceeding, which is at law. In the present case, the District Court held otherwise; and the State did not except to the ruling, and has not appealed from it.

Under the intimation of the court, the pleadings were amended so as to allow five of the aldermen to apply for an injunction as *an independent means of relief*, and this injunction the court made perpetual.

In this ruling, as above remarked, the court erred. Our reasons are as follows:

1. The right to a public office or franchise cannot, as the authorities above cited show, be determined in equity upon an *original bill* for an injunction.

2. The aldermen who applied for the relief, and, indeed, all the aldermen together, are neither *the* corporation nor *a* corporation.

And, if an *original bill* would in any case lie, it should, as it seems to us, be brought by the public officers or by the officer who was excluded from his right by the illegal claimant or usurper, or by the corporation, which is the city, and not all or a fraction of the aldermen.

3. The court, treating the injunction as an independent means of relief and not as ancillary to the proceedings by information (under chapter 151), made the injunction perpetual, and thus prevented the trial of the information proceedings which are at *law*, and which, under the statute, are to be tried in the usual manner of trying law actions.

Because the District Court erred in sustaining an injunction as an independent means of relief and in making the same perpetual, there having been no trial at law, its judgment is

Reversed.